NORTH AMERICAN CHEMICAL CO. v. KENO SUPPLY CO. (two cases).

KENO SUPPLY CO. v. NORTH AMERICAN CHEMICAL CO.

(Circuit Court of Appeals, First Circuit. October 14, 1915.)

Nos. 1117–1119.

1. PATENTS ☞328—INVENTION—PROCESS OF FILLING SHOE BOTTOMS.
　　The Thoma patent, No. 808,224, for the art of filling shoes, *held* void for lack of invention.

2. PATENTS ☞328—VALIDITY AND INFRINGEMENT—SHOE-FILLING APPARATUS.
　　The Arnold patent, No. 808,227, for a shoe-filling apparatus, *held* void for lack of invention, and also not infringed.

3. PATENTS ☞328—VALIDITY AND INFRINGEMENT—SHOE BOTTOM FILLER.
　　A decree affirmed, which holds valid and infringed the Thoma patent, No. 832,002, for a shoe bottom filler.

4. PATENTS ☞167—CONSTRUCTION—REFERENCE TO SPECIFICATION.
　　Claims in a patent are frequently explained, and must necessarily be explained, by reference to the specification; but claims which are lacking in the definiteness or clearness required by statute cannot be thus made good.
　　[Ed. Note.—For other cases, see Patents, Cent. Dig. § 243; Dec. Dig. ☞167.]

Appeals from the District Court of the United States for the District of Massachusetts; Frederic Dodge, Judge.

Suit in equity by the North American Chemical Company against the Keno Supply Company. From the decree, both parties appeal. Affirmed.

The following is the opinion of Dodge, District Judge, in the court below:

Three United States patents are in suit in this case, all owned by the plaintiff company. They are No. 808,224, issued December 26, 1905, to Andrew Thoma; No. 808,227, issued on the same day, to William B. Arnold; No. 832,002, issued September 25, 1906, to Andrew Thoma. All three were applied for on the same day, August 28, 1905.

The first-named patent (808,224) has 8 claims in all, and the bill alleges that 6 are particularly infringed by the defendant—Nos. 1, 3, 5, 6,

7, and 8. The second (808,227) has 10 claims; 2 of them, Nos. 1 and 8, being specified as particularly infringed. The remaining patent (832,-002) has 37 claims; 10 of them, according to the bill, Nos. 1 to 4, 6 to 10, and 14, being the ones particularly infringed.

No. 832,002, last mentioned, is for "shoe filler package and process of making the same." In his disclosure the patentee, Thoma, states that he has obtained the best results by mixing certain ingredients, in specified proportions, in a manner he describes, but has also found a number of means of attaining his object, all of which are not disclosed. The plaintiff calls this a patent covering a compound or manufacture, and speaks of it as the "product patent."

No. 808,224, also issued to Thoma, is said to cover the art of applying the filler of No. 832,002 to shoes, and the plaintiff speaks of it as the "process patent."

No. 808,227, to Arnold, is for an "improvement in shoe-filling apparatus," is said to cover the apparatus used in applying Thoma's filler to shoes by Thoma's process, and is spoken of as the "machine patent."

[1] The product of No. 832,002 being thus involved in the inventions described in the other two patents, it will be convenient to consider that (the "product patent") first. The specification is prolix, not always clear, and contains much unnecessary repetition. Its most important features may be stated in substance as follows:

The patentee begins by stating that the filler in common use at the time of his invention is made of comminuted cork mixed with rubber cement (rubber dissolved in naphtha). He refers at this point to United States patent to Howland No. 458,421 (1891), which describes a filler so composed. He then sets forth the disadvantages attending its use, as follows:

The volatile nature of the naphtha in the rubber cement requires a supply to be made fresh for each day's work, and involves large evaporation loss.

There is difficulty in handling the mixture so as to keep "the cement and adjacent articles clean."

The danger of fire from evaporating naphtha—perhaps the greatest disadvantage.

The mixture dries so slowly as to retard the work of the entire factory.

It soon becomes dry and brittle in the shoe, causing the latter to wear unevenly.

The patentee's filler, it is then said, cannot evaporate, nor lose its elastic, waterproof, etc., qualities by reason of age, but remains in proper condition, and adherent to the leather, during the life of the shoe. It can be made into convenient, portable package shapes, though not hard or solid, so as to be supplied ready made and stored until used, and it can be heated and cooled repeatedly without losing its characteristics. It has a low melting point, and cools or sets rapidly when spread thin on the damp shoe bottom. The patentee's object is stated to be:

"To do away with the delay of the slow-setting rubber cement filler, and with the objectionable features thereof due to the use of, and the evaporating of, the naphtha solvent."

How he attains his object is then disclosed. About five parts gutta percha, three parts resin, and two parts paraffin oil are mixed and subjected to a melting heat, which disintegrates the gutta percha and unites it with the resinous part. The mixture, rendered thin and smooth in two to four hours, by this means, is then thoroughly mixed with ground cork, or the like, and, being strongly adhesive, affords an excellent elastic medium between the cork granules. Cork or any other substance adapted to give body to the mass, and capable of elastic yielding in all directions, may be used. Instead of gutta percha, other vegetable gums (some of which are named), or low grade rubber, to some extent, may be used. The oil being varied in amount, according to their quality and its own quality, it may be either vegetable or mineral oil and either thick or thin.

The mixture is spread out in thin layers, partially cooled, then gathered into small quantities, compacted into loaf form, kept under pressure until stuck together in a mass, preferably compressed again when slightly cooler, and then provided with an external coating of ground cork, or other material capable of becoming part of the loaf which will adhere without sinking in, thus leaving the loaf not sticky enough to prevent ready handling, yet capable of being put into the melting pot just as it is.

One of the most important results of the invention, according to the patent, is the provision of a "portable ever-ready filler, having the characteristics mentioned." The "two most important distinguishing features" of the invention are later said to be: (1) The filler is unchangeable in character, instead of becoming brittle and non-sticky; (2) it is quick-setting, without becoming hard.

The patentee regards his invention as "broadly novel in certain particulars as pointed out in the claims," and therefore wishes it understood that in those particulars he is not limited to the preferred binder described.

Thirty-seven claims follow. Nos. 1 to 14 are for a shoe bottom filler consisting of a mass having characteristics described, or composed of a base and a binder having characteristics described.

All the claims said to be particularly infringed are claims included in this group. Nos. 15 to 32 are for a shoe bottom filler in the form of a self-contained loaf which is described in a variety of ways, and Nos. 33 to 37 are for the described process of making a self-contained loaf of shoe filler. No claim belonging to either of the two last-mentioned groups is specified as particularly infringed.

The defendant compounds the filler which it sells by employing a binder for its comminuted cork composed of the following ingredients: Resin, 9 pounds; pontianac resin, one-fourth pound; asphalt, 1½ pounds; brown pitch, 1½ pounds; oil, 8 pounds—these being the quantities used for each 12 pounds of cork. The above proportions are slightly varied according to circumstances. It does not appear that the defendant makes its filler into or sells it in the form of self-contained loaves like the plaintiff's. The method of mixing the ingredients does not differ materially from the patentee's method. The resulting compound is put into cartons or boxes, each holding 5 pounds.

227 F.—5

The defendant thus omits the gutta percha of the formula whereby the patentee says he has obtained the best results, using instead more resin and pontianac resin. The patentee has stated that other vegetable gums, pontianac among those he names, may be used instead of gutta percha. The asphalt and brown pitch, which are added in small proportion, fall under the description of mineral oils. The defendant, like the plaintiff, has provided a binder for its cork base without using an ingredient containing naphtha, and has thus done away with the delay due to the slow setting of a mixture containing naphtha, and the objectionable features due to its evaporation. It substitutes, for certain ingredients in the patentee's preferred mixture, only well-known equivalents. I see no reason to doubt that it makes its filler by what is in substance the method of the patent; and, restricting the claims in issue to a shoe-bottom filler produced according to the disclosure of the patent, I think they are infringed if they are valid. It does not seem to me that the patentee's described method of making a shoe bottom filler can fairly be said to be anticipated by the prior patents to Petersen (1882), Grunzweig (1889), or Goodall (1891). In neither of these is the production of a compound adapted for use in filling shoes contemplated, nor does either appear to show how such a compound may be made.

The plaintiff contends for a construction of the claims in suit much broader than that above indicated. It insists that the invention patented is "of a pioneer character," and that, especially since this is true, the patentee is entitled to claim his product "identified by its physical characteristics"; thus covering every article possessing the specified characteristics, without regard to the ingredients which compose it or the method whereby it is compounded.

I do not find sufficient ground to believe that the invention described in this patent is properly to be regarded as "pioneer" in character, or that the product thereof is "new" in the sense necessary to support the plaintiff's contention. So far as appears from the disclosure of the patent, the patentee did no more than show how to make a filler free from the disadvantages he mentions involved in the use of fillers containing naphtha. Except for those disadvantages, the rubber cement filler does not appear to have been unsatisfactory. The evidence affords reason to believe that, apart from them, it was little, if any, inferior in any essential respect to that produced by the patentee, provided that the rubber cement was of the best quality and free from adulteration. What the patentee provided, therefore, was an improved filler, but not one sufficiently superior in quality or different in kind from anything before known to justify calling it a new filler, or regarding the patentee as first in a new field of invention.

That the use of rubber cement fillers has been almost everywhere abandoned in favor of a filler made and sold by the plaintiff under the name of "Besto" may be regarded as proved. But it has also appeared that the binder employed in making "Besto" contains hardly any of the ingredients mentioned in the patent and is not prepared according to the method therein described. It is made mainly of "wax tailings," or the resinous residuum of petroleum, rendered properly elastic by the addition of a very small amount of paraffin oil, and, according to the

disclosure of a later United States patent issued to Thoma July 30, 1907 (No. 861,555), for an improvement in innersole fillers. Thoma's application for this patent was filed May 15, 1905. It further appears that the plaintiff has made and sold fillers according to the patent in suit only to a limited extent, having almost immediately substituted "Besto," because "wax tailings" cost so much less than gutta percha; also that "Besto" has been preferred by purchasers who formerly used rubber cement filler because it was so much cheaper. In view of all the above, the undisputed commercial success of "Besto" affords little reason for crediting the patentee with the invention of a new filler, or with having been a pioneer inventor. The quick disappearance of the old rubber cement filler as soon as purchasers were able to obtain "Besto" is fully accounted for by the fact that the new filler was cheaper and answered the purposes of the old filler without involving the use of naphtha, and is no indication that the new filler was also regarded as superior in other respects.

Thoma states, in his "Besto" patent No. 861,555, that it is subordinate to his copending application for his patent No. 832,002, now under consideration, and that he has therein—

"placed the broad claims which are generic to the several different varieties of shoe filler, * * * the present case being restricted to the species of my filler which depends upon the resinous residuum of petroleum or sticky wax tailings."

This is another way of stating the claim he makes here, that the invention described in the patent under consideration is of a character which entitles him to cover every composition for filling shoes, however made or from whatever materials, if only it, or the base or the binder employed in it, can be said to have such qualities as the claims in suit mention. Claim 9, which may be taken for an example, is as follows:

"A shoe-bottom filler, consisting of a permanently plastic, quick setting, waterproof mass adherent to leather, and composed of a finely comminuted filler material whose granules are thinly coated with a tenacious, tough binder, which is rendered temporarily highly fluid by moderate heat."

No decision is found in which it is held or recognized that the product of a described process, whether it be called a manufacture or a composition of matter, can properly be claimed in terms like these, so as to cover every product to which the same terms are capable of application. If there are any circumstances in which such claims for a product could be held valid to their full extent, I am unable to believe that they can be so treated in a case like this, where the invention is, at most, of an improved filler, not of one wholly different in kind from any that preceded it. In American, etc., Co. v. Howland, etc., Co., 80 Fed. 395, 400, 25 C. C. A. 500, upon which the plaintiff relies, it was held that the patentee's claims for an improved pulp digester, covering, among other things, a continuous lining "of cement," without specifying the kind of cement, were not limited to ordinary hydraulic cement, or to the particular cementitious mixtures he had chemically and commercially isolated as individuals, but were to be construed as including all such mixtures as ordinarily skilled chemists might be expected to find as answering the described conditions. Not only does this fall far short of

what is required to sustain the plaintiff's contention, but the patentee's conception in that case was wholly new. He had "discovered a new property or force in matter"; i. e., that cement or cementitious mixtures generally would adhere to the iron shell of a digester, resist hot acid, and protect the shell therefrom. Thoma cannot be said to have made any discovery of such character. In view of the fact that he appears to have devised and disclosed an improvement of value, I do not regard the character of his claims in suit as sufficient ground for holding them invalid, as the defendant contends; but I cannot give them a construction broader than that adopted above.

[2] Coming next to the "process patent," No. 808,224, the patentee declares in his specification that, besides providing a filler which will neither evaporate, cave in, cling to the tool, or remain moist and refuse to set indefinitely, he has devised a method which makes the shoe absolutely waterproof, gives it "a high degree of pliability and elasticity or resiliency of tread," securing at the same time the main advantages of quick setting, perfect adherence to the leather, even if damp, economy, uniformity, and neatness. He refers to the Arnold machine (being the machine of patent No. 808,227), which he says has been invented for carrying out his method commercially.

What is to be done in carrying out his "method" is next stated. The first step is to prepare—

"a filler of any suitable materials which will be permanently pliable, will not evaporate, will adhere firmly and permanently to leather or the like, and be semi-solid when cold, and freely plastic or semi-fluid when properly heated, and will be quick setting, such a compound being formed of a mixture of comminuted cork, gutta percha, resin, and paraffin oil (about five parts of the gutta percha to three of the resin and two of the oil), and when these are thoroughly mixed under heat the resulting filler may be permitted to stand indefinitely."

The next step is to provide a suitable machine or mechanism; the Arnold machine being shown in the accompanying drawings, and referred to as an instance of such a machine.

Having provided the filler and mechanism as above, pails, contained in the steam-jacketed top of the machine, are filled with the filler and heated by turning steam into the steam jacket. The filler in the pails, being thus melted, is turned in this condition into a dip pot, also contained in the steam-jacketed top. The melted filler in proper quantity is taken from the dip pot and spread upon the inner sole of the shoe into the cavity to be filled. The body of filler thus placed in the cavity is pressed against a roll kept hot by the steam which heats the steam jacket, being admitted thereto through a pipe forming the axis of the roll. By this pressure against the hot roll the outer surface of the filler in the cavity is "superheated," the binder of the filler is caused to flow or spread laterally into all corners of the cavity and in the sewing of the shoe, so as to form tight joints, the top surface of the filler compressed, smoothed, and leveled, and the filler spread by the vertical pressure of the roll, not only so as to fill all crevices, needle holes, etc., but so as to adhere to the bottom and sides of the cavity. The shoe is then ready to have its outer sole attached in the usual manner.

The patentee then declares that a shoe thus constructed has "permanent solidity" and even wearing qualities, a high degree of resiliency and pliability, is permanently waterproof, in comparison with "the old construction," is equally light, less expensive, and more quickly made, and that its construction, being "performed under heat," gives a "homogeneous character" to the parts, which, when subjected to pressure under heat, are all bound together by the filler.

The patentee next restates the advantages possessed by his filler, in virtue of the fact that there is no naphtha in it, in much the same terms as used in his "product patent."

He concludes by stating that he wishes it understood that he is not limited to the mechanical details shown, that the ingredients of his filler may be varied, that he has several fillers meeting the requirements of his method, that that filler and other details are covered in other applications, and that this is limited to the art or method forming part of his "new system of shoe manufacture."

Apart from the patented filler of No. 832,002 and the patented machine of No. 808,227 (below considered), I can find no patentable novelty in what this patent discloses. Whatever else the patent describes amounts to nothing more, so far as I can see, than causing plastic materials which heat will soften to fill a cavity by pressure with a heated tool. This seems to me an obvious mechanical process, involving no inventive idea, given the patented filler, whether Arnold's or any other "suitable" machine be used in carrying it out. Finding nothing patentable in the described method of putting the filler into the shoe, I hold this patent invalid.

[3] Finally, as to the Arnold patent, No. 808,227, the apparatus therein described, as has been stated above, consists of a steam-jacketed table, comprising steam-jacketed compartments, each to receive a filling pot for melting the Thoma filler and closed by a cover, and containing also an adjacent shallow dip pot, above the rear end whereof is the roll above mentioned in considering patent No. 808,224. This is heated by steam, which passes into and heats the steam-jacketed table through a pipe whereon the roll turns as its axis. The patent calls the roll a "superheating tool," and declares that it constitutes the most important feature of the invention by reason of its position close to the delivery end of the dip pot. The roll is so shaped as to have a surface in part straight, in part concave, and in part convex, so that the shoe may be pressed against either as required to give the filler the exact surface and compression desired. On the top of the steam-jacketed table, conveniently near the dip pot and roll, is an arrangement into which dip knives used in spreading melted filler on the shoe may be thrust, when not in use, and kept hot by being pressed against the heated surface of the table, so as to have a heated knife always at hand for use in transferring filler from the dip pot to the shoe, without chilling it by the use of an unheated knife.

The two claims said to be particularly infringed are:

"1. In a shoe-filling apparatus, means for supplying hot filler for a shoe, and superheating means mounted close to the delivery end of said supplying means for instantly applying a superheated contact over the top of the filled surface of the shoe."

"8. In a shoe-filling apparatus, a heated dip pot for supplying hot filler for a shoe, a stand provided with a superheating tool mounted close to the open end of said pot in position to permit the shoe, when filled, to be freely and instantly manipulated in pressing engagement with said superheating tool, and quick-heating means at one side of said dip pot for heating the dip knives used for applying the filler from to pot to the shoe."

I am unable, notwithstanding the presumption in favor of the patent and the plaintiff's argument, to believe that this patent describes anything more than an aggregation of familiar devices, each performing its separate function and accomplishing its separate result in substantially the same manner and to substantially the same extent as if they had not been brought together in one structure resting on the same support. Each is separately and successively used. I can see no result which can properly be regarded as due to their combined operation. It is doubtless highly desirable to have the melted filler close to the hot roll against which it is to be pressed when on the shoe, and to have the dip knives kept hot in a place close to the filler supply and the roll; but juxtaposition is not combination. It is true that the patentee not only brings the separate devices close together, but also supplies them all with heat from the same steam. This, however, does not seem to me enough to make any substantial difference. In bringing the separate devices together as above, I think it clear that nothing beyond ordinary mechanical skill was required, and nothing which can fairly be called invention involved.

I am obliged to consider this patent invalid for want of patentable invention. I should be unable, in any event, to treat the claims as covering anything except the particular structure shown and described. So construed, they are not infringed. The defendant's steam-jacketed kettle has no roll, but has a portion of its outer surface flat, and kept hot, of course, by the steam within the jacket. The operator, having filled the shoe with heated filler from the kettle, presses the filler into the shoe by wiping or smoothing it against this flat portion of the heated kettle.

The claims in suit of patent No. 832,002 are therefore held valid and infringed by the defendant. The claims in suit of the other two patents are both held invalid. There may be a decree accordingly.

W. Orison Underwood, of Boston, Mass., for plaintiff.
Francis J. V. Dakin, of Boston, Mass., for defendant.

Before PUTNAM and BINGHAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. This case depends upon alleged infringement of three patents for invention. The first is No. 832,002, application filed on August 28, 1905, and patent issued on September 25, 1906, to Andrew Thoma. This is for the filler, and is entitled "Shoe-Filler Package, and Process for Making the Same," and is spoken of in the District Court as being for the "product." The next patent was issued to the same Andrew Thoma on December 16, 1905, on an application filed on August 28, 1905, entitled to be for "the art

of filling shoes," and is spoken of as for the "process." The third patent was issued to William B. Arnold on December 26, 1905, on an application filed on August 28, 1905, and is entitled as for "shoe-filling apparatus," and said to be "the machine or machinery," and is also said to cover the apparatus. All three are supposed to relate to the same art.

The opinion of the learned judge of the District Court in these cases was passed down on February 6, 1915. It sustained the bill so far as patent No. 832,002 was concerned, and entered thereon an interlocutory decree for an accounting and an injunction. On the other patents, namely, 808,224 and 808,227, being one for the process, and the other for the machine or machinery, the bill was ordered to be dismissed, with costs. Both parties appealed to this court.

[1, 2] The learned judge of the District Court gave the case a very thorough and elaborate consideration, and passed down a correspondingly thorough and elaborate opinion. So far as patents Nos. 808,224 and 808,227 are concerned, this court agrees with that opinion, and the facts stated and the reasoning of the court are so full that it is the work of supererogation to go over the matter in detail, or do more than accept its conclusions in reference thereto, and so far as those two patents are concerned we accept that opinion as the opinion of this court, and reaffirm the judgment entered by him without further detail.

[3] With reference to patent No. 832,002 our views are not entirely harmonious with those of the District Court, and therefore we state them to some extent. There had been a great deal of shifting with reference to the claims in that patent, with many amendments of a substantial character. It all came down finally, so far as we are concerned, into the following claims, Nos. 1, 2, 3, 4, 6, 7, 8, 9, 10, and 14:

"1. A shoe bottom filler, consisting of a base united with a binder into a permanently tenacious, quick-setting, permanently elastic mass, capable of being molded into a thin pliable layer filling the shoe bottom.

"2. A shoe bottom filler, consisting of a normally unchangeable, permanently elastic, quick-setting mass, composed of a base capable of yielding in all directions to pressure, united with a permanently sticky component.

"3. A shoe bottom filler, consisting of a normally unchangeable, permanently elastic, quick-setting mass, composed of a base capable of yielding in all directions to pressure, united with a permanently sticky component having a low melting point.

"4. A shoe bottom filler, consisting of a normally unchangeable, permanently elastic, quick-setting mass, composed of a base capable of yielding in all directions to pressure, united with a permanently sticky component having a low melting point and serving to render said mass waterproof."

"6. A shoe bottom filler, consisting of a resilient base united with a viscous binder into a permanently tenacious, quick-setting, permanently elastic, and water repellant mass, capable of being molded into a thin, pliable layer, filling the shoe bottom.

"7. A shoe bottom filler consisting of a normally unchangeable, permanently elastic, quick-setting mass, composed of finely comminuted filler material, having each granule thinly coated with a permanently sticky binder, capable of being rendered highly fluid by moderate heat.

"8. A shoe bottom filler, consisting of a filler body in a fragmentary condition, thoroughly mixed with a binder into a permanently tenacious, quick-setting, permanently elastic, and moldable mass of a nonshifting consistency when cold.

"9. A shoe bottom filler, consisting of a permanently plastic, quick-setting, waterproof mass adherent to leather, and composed of finely comminuted filler material whose granules are thinly coated with a tenacious, tough binder, which is rendered temporarily highly fluid by moderate heat.

"10. A shoe bottom filler, consisting of filler material in a fragmentary condition, and a binder which is permanently elastic, quick-setting, and permanently sticky; said fragmentary filler material and binder being thoroughly mixed together in the presence of heat for use in filling the shoe."

"14. A shoe bottom filler, consisting of comminuted filler material, held compactly together by a permanently flexible, viscous binder, in a permanently elastic mass of a consistency suitable for filling in the cavity between the inner sole and the out sole of a shoe; said mass having a low melting point and being compressible and resilient when cold."

This patent was finally left with claims numbered 1 to 37; but the case was accepted by the District Court as standing on the claims which we have copied. The other claims were accepted by it as not essential to this litigation, probably because they were not in their terms infringed, as they were more specific, in that they described somewhat particularly various articles which went into the combinations, as, for example, five parts of gutta percha, and three parts of resin, and two parts of paraffin oil were enumerated as "binders," while comminuted cork was given as the filling; but we have nothing to do with this as the case stands before us. It now rests entirely on the claims which we have quoted, and which contain no practical express enumeration of the various substances which enter into the product, or of the quantities of these substances, or of any of them. It will be seen that, in the claims so said to be in issue, there is an entire absence of all such specific proportions or elements, and that everything is left standing upon its qualities as described in them, with nothing whatever to enable any one ordinarily skilled in the art to determine the proportions or qualities required, except by experiment. Therefore, so far as these claims are concerned, the case is subject to the rule fully determined by many decisions of the Supreme Court, and given in Walker on Patents (4th Ed.) § 178, as follows:

"The statutory requirements, relevant to particularity in the descriptions and claims of letters patent, are conditions precedent to the authority of the Commissioner of Patents to issue such documents; and, if such a document is issued, the description or claims in which do not conform to these requirements, then that document is void."

In this patent the patentee seems to be confused between the "process" and the "product," and he confused the title of the patent accordingly. All that is left now is the "product"; but it is a "product" whose usefulness depends upon the proportions of the various elements contained in it. Therefore, they need the same particular and plain statement as they would if they related to "process."

The reason of this rule is convincing, and in the eyes of the law the rule is a simple one; but its application in practice is sometimes very difficult, as shown in Wood v. Underhill, 5 How. 1, 5, 12 L. Ed. 23, which was a case of the "composition of matter," or "product," where the two courts differed. In the case at bar, which with reference to the claims which absolutely lack any statement of any specific proportions, it is plain that the application of this rule is difficult, because the specification deals at great length with numerous elements neces-

sary to be taken into consideration before it can be determined that the generic expressions in these claims which we have copied are capable of any certain application, or any application except one involving experiments by persons who are only ordinarily qualified in the art, or the use of the spirit of invention.

[4] We have already said that the case rests entirely on the claims. To speak accurately, we should say that the case rests on the claims according to the language which they have used, and that the claims in the language in which they are expressed cannot lawfully be applied by drawing on the specification. The claims, of course, in a patent, are frequently explained, and must necessarily be explained, by reference to the specification; but claims which are lacking in definiteness, or clearness, in the way to which Mr. Walker refers, cannot be thus made good. The claims must stand as good or bad by a determination based on the ordinary rules of interpretation.

The court below seems to have gone outside of the claims for the purpose of finding an interpretation for them, and seems to have accepted the invention intended to be covered, not merely by reading the claims under the ordinary rules of interpretation, but by supplying that in which the claims are absolutely lacking—precision and definiteness. Nevertheless we have carefully examined the positions of the respondent, and we do not find that the claims were asserted to be defective or void by reason of the propositions to which we have referred; so that, notwithstanding what we have said in reference thereto, we do not feel justified here in assuming to be wiser than the parties, or assuming to declare claims void for reasons not asserted. Consequently we have been compelled to draw out from the opinion of the court below for what reason it held this patent valid.

This seems to come down to the proposition contained in the opinion as follows, referring therein to the inventor, namely:

"In view of the fact that he appears to have devised and disclosed an improvement of value, I do not regard the character of his claims in suit as sufficient ground for holding them invalid; but I cannot give them a construction broader than that adopted above."

This apparently refers to the following paragraph in the opinion of the court, namely:

"No decision can be sound in which it is held or recognized that the product of a described process, whether it be called a manufacture or a composition of matter, can properly be claimed in terms like these so as to cover every product in which the same terms are capable of application. If there are any circumstances in which such claims for a product could be held valid to their full extent, I am unable to believe that they can be so treated in a case like this, where the invention is at the most of an improved filler, and not of one wholly different in kind from any that preceded it."

The effect of all this seems to be that the District Court held that it could not sustain the patent to the full extent of the language of the claims which we have cited, but found that the patent contained something narrower in its practical effect than what is called for by the language of the claims as read without restriction. In other words, the opinion seems to have gone through the whole state of the art and

the circumstances explained in the specification, and gathered from the whole what it found to be new. Therefore, while we make out that, after all, the language of these claims may be insufficient, within the rule which we have cited from Mr. Walker, yet, in view of the fact that neither the court below nor the respondent stands on propositions of that character, we feel that it is going beyond the province of this court to assert such a proposition, which plainly involve serious difficulties.

We apprehend, however, the difficulty arising from the fact of sustaining the patent on a narrower reading than the natural reading of the claims in controversy, and that under the circumstances the invention, as we are sustaining it, is a narrow one, while the claims themselves are perhaps broad. It is therefore necessary for us to caution the profession and the public that the patent is always to be read and interpreted in the manner in which the learned judge of the District Court interpreted it, and not with a mere reference to some possible interpretation which may be put on the claims.

The decree of the District Court is affirmed, and neither party recovers any costs of appeal.

BINGHAM, Circuit Judge, concurs in the result.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes