### NORTH AMERICAN CHEMICAL CO. et al. v. DEXTER et al.

#### (District Court, E. D. Wisconsin. August 1, 1916.)

1. PATENTS ⬦⟶170—CONSTRUCTION—REFERENCE TO CLAIMS OF COPENDING PATENTS.

    Where patents were practically concurrent and copending, each one seeking to be contributory to the advance or change in the art, but referring expressly to each other and to the general purpose to be accomplished by all of them, the court, in considering the claims of one patent, must do so in view of the time and conditions under which the copending patents were brought out, in order to ascertain the true intent and construction to be placed on each.

2. PATENTS ⬦⟶328—VALIDITY AND INFRINGEMENT—SHOE BOTTOM FILLER.

    Thoma patent, No. 832,002, covering a shoe filler package and process of making it, *held* valid and infringed.

3. PATENTS ⬦⟶328—VALIDITY AND INFRINGEMENT—SHOE BOTTOM FILLER.

    Thoma patent, No. 861,555, on inner sole shoe filler, *held* valid and infringed.

4. PATENTS ⬦⟶328—INVENTION—PROCESS OF FILLING SHOE BOTTOMS.

    Thoma patent, No. 808,224, for the art of filling shoes, *held* valid.

5. PATENTS ⬦⟶328—VALIDITY AND INFRINGEMENT—SHOE-FILLING APPARATUS.

    The Arnold patent, No. 808,227, for a shoe-filling apparatus, *held* valid and infringed.

---

⬦⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by the North American Chemical Company and others against Alvin S. Dexter and others for infringement of patents. On application for injunction, pendente lite. Injunction granted.

See, also, 252 Fed. 169.

Edward Rector, of Chicago, Ill., and Quarles, Spence & Quarles, of Milwaukee, Wis., for plaintiffs.

Gillson & Gillson, of Chicago, Ill., Clyde L. Rogers, of Boston, Mass., and E. H. Bottum, of Milwaukee, Wis., for defendants.

GEIGER, District Judge. The plaintiff, as owner of Thoma patents, 808,224, December 26, 1905, covering "art of filling shoes"; 832,002, September 25, 1906, covering "shoe filler package and process of making same"; 861,555, July 30, 1907, "on innersole filler"; and Arnold patent, 808,227, December 26, 1905, covering "shoe-filling apparatus"—has brought this suit against defendants, charging infringement. It is before the court upon an application for an injunction pendente lite, and has been presented upon the bill, the answer, and supporting and opposing affidavits of the parties respectively.

These patents, relating as they do to the shoe-filling art, may be better understood upon brief reference to certain figures and the subject-matter of the patent to Howland, 458,421, August 25, 1891:

Fig. 1.

Fig. 2.

Fig. 3.

Each of these represents a cross-section of an upturned shoe bottom. In each, $A$ is the insole, curved and lipped at the outer edge; $B$ is the lower part of the vamp, or shoe upper; $C$ is the welt; $D$, the filler; and $G$ is the outersole. The shoe-filling art therefore comprehends the constituency of this filler, as well as methods, means, etc. Howland, after referring to the existing practice of making "fillings of felt, leather, or other materials in sheet form, and securing them by flour paste, which requires considerable skill," etc., declares his invention to consist of a plastic composition of leather scraps and rubber cement, to be spread upon the shoe bottom by a spatula or otherwise. Of rubber cement, he says:

"It is understood to be manufactured mainly from the cheaper qualities of African rubber with petroleum naphtha. Its constituents vary every moment by the evaporation of the naphtha by exposure to the air. Under ordinary conditions, working rapidly in the open air, I think about five pounds of finely cut leather will require ten pounds of rubber cement; but the proportions should be varied, so as to give just sufficient consistence to allow the spreading of the composition."

His claim corresponds with these specifications.

The patents in suit are, without doubt, addressed to the art as it existed after the issue of Howland's patent. Speaking broadly, patent No. 832,002 is claimed by plaintiff to embody his broad and generic claims, as well as a claim for the specific kind of filler which will be referred to as his gutta percha filler. It also contains a set of claims covering the package—the putting up of the filler in loaf form, and incidentally the process of making the so-called "self-contained loaf." Patent No. 861,555 covers the specific kind of filler referred to as the "wax tailings" filler. Consideration of the two patents involves in reference to their specifications and claims, among other things:

(1) The broad purpose, stated in patent 832,002, "to advance the cleanliness, economy, safety, and speed of shoe manufacture, * * * and afford means for improving the shoe in permanent pliability, durability, and waterproof qualities," and, in that connection, the art upon which he is building and the change to be wrought by his invention are thus referred to:

"The almost universally used filler at the present time is made of comminuted filler material, usually cork mixed with a large quantity of rubber cement (rubber dissolved in naphtha), and on account of the exceedingly volatile nature of the naphtha, as stated in United States patent No. 458,421. of August 25, 1891, each shoe factory is obliged to make its own filler each day, and even then the loss from evaporation is very large, while the inconvenience and difficulty of handling and keeping the cement and adjacent articles clean is a serious disadvantage, and perhaps the greatest disadvantage is due to the danger of fire on account of evaporating naphtha. Moreover, in use this filler is very slow in drying, particularly in humid weather, so that it retards the progress of the entire factory, and in the shoe soon becomes dry and brittle, so that the desired support to the shoe is thereby withdrawn, causing the latter to wear unevenly, and inviting the entrance of moisture, etc. Accordingly I have succeeded in devising a filler which cannot evaporate or change its pliable and elastic, viscous, and waterproof character by use or age, but remains resilient, properly soft or workable, adherent to the leather, and permanently durable for an indefinite period until used, and thereafter continues in proper condition until the shoe is worn out. In order to reach

success, from a practical standpoint, I have found that the greatest difficulty has been to produce a filler in such form that, notwithstanding the fact that it is not hard or solid, it is self-sustaining, and hence can be made into convenient package shape for cheap crating and storing in factories until required for use, thereby rendering it feasible for general use. The conditions of use are peculiarly exacting, as the leather is usually damp, due to the soaking thereof for facilitating turning up the channel lip, and yet the filler material must penetrate and stick to the leather sufficiently to prevent shifting and bunching. The oily repellant nature of leather must also be considered. Besides meeting all these exacting conditions, my filler has the predominating characteristics of being unchangeable, in the sense that it does not keep on drying and oxidizing, as does the naphtha rubber cement filler, but maintains permanently its elastic, moldable, tenacious character, even when exposed, as in an ordinary box or packing case, and is capable of being heated and cooled repeatedly without losing these characteristics, it has a low melting or softening point, so that there is never any danger of charring or injuring the cork or destroying its efficiency, and it rapidly cools or sets when spread thin on the damp shoe bottom; also this filler meets the long unsatisfied demands of the shoe trade for a portable ground cork filler which can be provided ready-made as an article of merchandise. To this end I have at length succeeded in devising a filler loaf which retains its characteristics of pliability, internal stickiness, elasticity, durability, etc., without deteriorating, and which can be transported and handled with impunity, and will be neatly available for instant use whenever wanted."

He further says that, while he has found a number of means of attaining his object, the best results have been obtained through a—

"mixture of about five parts gutta percha to three parts of resin and two parts of paraffin oil, and subject this mixture to a melting heat which disintegrates the gutta percha and causes it to unite with the resinous part; the oil helping in the assimilation of both ingredients and giving a temper or smoothness and pliability to the product."

After two to four hours, the product has a consistency adapting it for use as a binder, to be used in admixture with ground cork, and forming therewith, upon cooling, an elastic union. Cork, while preferable, may have as substitute any substance as a base which will give body, provided it be capable of "yielding in all directions under pressure or bending," and that it recover its position when the strain is released. The base, either in and of itself, or in union with the fillers, makes a permanently elastic, unchangeable, and quick-setting filler.

A further specification is use of other "vegetable gums" as substitute for gutta percha; their possible want of stability, their tendency to harden or to lose elasticity or pliability, is met by varying the quantity of oil added. The method of mixing, while in a heated state, then partially cooling, forming into a "loaf," and its use in this form in the factory, according to patent No. 808,224, hereafter noted, are described. The patent adds:

"I regard my invention as broadly novel in certain particulars, as pointed out in the claims, and therefore wish it understood that in those particulars I am not limited to the preferred binder herein described, and also, as already intimated, many other variations may be resorted to, within the spirit and scope of my invention."

The claims here in question are the broad generic claims, such as 1, 4, and 7, viz.:

"1. A shoe-bottom filler, consisting of a base united with a binder into a permanently tenacious, quick-setting, permanently elastic mass, capable of being molded into a thin, pliable layer, filling the shoe bottom."

"4. A shoe-bottom filler, consisting of a normally unchangeable, permanently elastic, quick-setting mass, composed of a base capable of yielding in all directions to pressure, united with a permanently sticky component having a low melting point and serving to render said mass waterproof."

"7. A shoe-bottom filler, consisting of a normally unchangeable, permanently elastic, quick-setting mass, composed of finely comminuted filler material having each granule thinly coated with a permanently sticky binder, capable of being rendered highly fluid by moderate heat."

The claims, 15 to 29, for the loaf form of package, whereof 15 and 20 may be taken as illustrative:

"15. As an article of manufacture, shoe-bottom filler in the form of a self-contained permanently elastic loaf, composed of comminuted filler material, whose individual granules are thinly coated with a nonvolatile, permanently resilient, and viscous binder; said loaf being normally semiplastic and rendered sluggishly fluid by heat."

"20. As an article of manufacture, shoe-bottom filler in the form of a self-contained permanently elastic loaf, composed of comminuted filler material, whose individual granules are thinly coated with a nonvolatile, permanently resilient, and viscous binder; said loaf being normally semiplastic and rendered sluggishly fluid by heat, and having a dry external, adherent coating of filler material."

Claims specifying gutta percha as a binding, viz.:

"30. As an article of manufacture, a shoe-bottom filler, composed of comminuted filler material mixed with a binder composed of approximately five parts of gutta percha, three parts of resin, and two parts of paraffin oil, in proportion to the filler material sufficient simply to completely coat each granule thereof."

"31. As an article of manufacture, a shoe-bottom filler compressed into the form of a self-contained loaf, composed of comminuted cork, whose individual granules are thinly coated with a binder composed of approximately five parts of gutta percha to three parts of resin and two parts of oil; said cork and binder being in such proportion as to maintain said loaf normally in a semiplastic condition."

Coming now to patent 861,555, it covers, as above indicated, the species of filler having "wax tailings" as a binder for the cork. Claims 1 and 3 may be taken as illustrative:

"1. A shoe-bottom filler, consisting of a nonoxidizing, permanently plastic, quick-setting mass, composed of finely comminuted filler material having each granule thinly coated with a permanently sticky binder containing resinous residuum of petroleum in a waxy condition."

"3. A shoe-bottom filler, consisting of a filler body in a fragmentary condition thoroughly mixed with a binder containing wax tailings of petroleum and a modifying agent so compounded as to render the mixed filler mass permanently elastic, pliable, and tenacious as described, yet sufficiently stiff to prevent shifting or bunching in the shoe bottom and to be self-sustaining for transportation."

This patent, though later in date of issuance, was applied for some months earlier than patent No. 832,002; and what transpired during the copendency of the two in the Patent Office is of some conse-

quence in determining the scope and interpretation of their respective claims—particularly those of patent No. 832,002. The application in the latter disclosed the species of gutta percha binder; whereas the earlier application (new patent 861,555) disclosed the specific form of wax tailings filler, but also contained the broad generic claims now found in the earlier patent, issued upon the second application as above noted. It is urged that, under the law and the practice in the Patent Office, applicant was entitled to a broad and generic claim, or set of claims, covering all of the various species of his new filler and any other species having the physical properties and characteristics which distinguished his filler from the prior art, and was also entitled to specific claim or claims for each species of his new filler; that is to say, it was permissible for him to include in one application a broad and generic claim and a claim or set of claims for *one* species, but not for more than one. Therefore, so it is urged, full protection to the generic and specific invention demanded that he proceed in accord with such practice, and thereupon this happened: The broad or generic claims appearing in the first application (now patent No. 861,555) were transferred to the second application (now patent No. 832,002)—among them claims 7, 8, 9, and 13—while other broad claims, 1 to 6, were also added to the latter. This action was not only communicated on the record of the proceedings thus:

"We have transferred the broader claims to applicant's copending application, above referred to, as being fully as proper in said application, which contains certain other broadly novel features, thereby getting together in one case the broad features of invention, and leaving the present case to cover the petroleum species of filler"

—but the result thereby sought was further incorporated into the specifications of patent No. 861,555 in this language:

"The present case, however, is subordinate to my copending application, now patent No. 832,002, granted September 25, 1906, in which I have placed the broad claims which are generic to the several different varieties of shoe filler or filler material and compounds; the present case being restricted to that species of my filler which depends upon the resinous residuum of petroleum or sticky wax tailings."

And when the additional broad claims (now 1 to 6 in 832,002) were introduced, this was said of record:

"As explained in our previous amendment, it is intended to make this case the generic case, to cover broadly all the various species of Mr. Thoma's filler."

And in subsequent applications for patents containing claims for specific kinds of filler, Thoma set out the subordination thereof to his "foundation patent 832,002," and apparently such patents proceeded in recognition of that as the character of No. 832,002.

Patent No. 808,224 covers a method. Its specifications also show that it was addressed to the art as left by the naphtha rubber filler of the Howland patent—to the disadvantages noted in the other

patents referred to. For the present, claims 1 and 8 may be taken as illustrative:

"1. In the herein described art, providing a filler composed of comminuted filler material held compactly together in a semisolid mass by a permanently flexible, viscous binder, capable of liquefying under heat, slowly heating said mass until sluggishly fluid, applying the heated filler to the shoe to be filled, and subjecting the same to vertical pressure while still hot."

"8. In the herein described art of shoe manufacture, providing a filler composed of comminuted filler material held compactly together in a semisolid mass by a waterproof binder capable of liquefying under heat, filling the shoe cavity with said filler, and then applying a sudden and strong heat to said filler for liquefying a portion of its waterproof binder, and applying external pressure to the filler for forcing said binder into the joints and stitches about said cavity."

This reservation with respect to the scope of the claims is made in the specifications:

"I wish it understood that I am not limited to the mechanical details in any way as herein shown, and that the ingredients of my filler may be varied (I have several fillers meeting the requirements of my method), and that the filler and other details herein shown and described are covered in other applications; the present application being limited to the art or method forming part of my new system of shoe manufacture."

This brings us to the Arnold patent, 808,227, issued on the same date as the method patent last above. The invention is declared to be a "machine for rendering feasible the application of the Thoma filler," and, after distinguishing the latter in general terms from the naphtha rubber, the specifications and drawings describe the machine thus:

"In the drawings, Fig. 1 is a top plan view of my filler-applying apparatus, Fig. 2 is a vertical longitudinal section thereof, Fig. 3 is a transverse sectional view showing the shape of the dip pot, and Fig. 4 is a fragmentary sectional view showing the dip knife heater. I provide on standards *1* a steam-jacketed table *2*, containing a suitable source of filler supply, herein shown as comprising three compartments *3, 4, 5*, each steam-jacketed and adapted to receive filling pots *6, 7, 8*, and to be closed by a cover *9* for slowly melting the filler. Adjacent these supply compartments the table contains a shallow dip pot *10*, having a wide-open mouth and preferably projecting upwardly and forwardly at *11* and surrounded by a flaring drip guard *12*. Above the rear end of the dip pot is a superheating tool, herein shown as consisting of a roll *13*, mounted to turn freely on a steam pipe *14*, steam entering in the direction of the arrow *15*, and after heating said roll passing downwardly at *16*, into the table at *17*, and thence out at *18*. The steam pipes *14, 16*, form a heating stand for the roll. This superheating tool constitutes the most important feature of my invention, as I have found that, by providing this highly heated roll close to the delivery end of the dip pot, so that the operator can instantly raise the filled shoe into contact therewith and superheat the top surface of the filler, an exceedingly quick, neat, and satisfactory result can be obtained. The roll has a concave surface *19*, a straight surface *20*, and a convex surface *21*, thereby enabling the operator to give the exact surface and compression desired to the filler and to accurately regulate the quantity left in the cavity of the shoe or in any part of said cavity. To prevent chilling the filler, the dip tool or knife must be kept hot, and accordingly I provide convenient means for this purpose, having shown herein the table as projecting at *22* to form a flat ledge, over which are a series of weights *23*, carried by a rod *24*, pivoted in post *25* and abutting against a ledge *26*, so that a dip knife *27* may be simply thrust quickly beneath said weights, which yield to receive the same, and yet hold the blade of the knife down tightly on the hot table, so that the knives become quickly heated. The table and weights are readily cleaned simply by swinging the weights and rod over forward on the post *25*. The ledge *26* serves to limit the free upward tipping of the weights and also prevent them from sliding back on the table when the knives are thrust beneath them. I provide a number of these knives, so that a new one is always ready."

As illustrative of the claims allowed, we may take Nos. 3 and 8.

"3. In a shoe-filling apparatus, a heating stand provided with a freely rotatable roll maintained uniformly hot thereby and having a free open space at the under side of the roll, constructed to permit the free manipulating of a filled shoe while held pressed upwardly against said roll."

"8. In a shoe-filling apparatus, a heated dip pot for supplying hot filler for a shoe, a stand provided with a superheating tool mounted close to the open end of said pot, in position to permit the shoe when filled to be freely and instantly manipulated in pressing engagement with said superheating tool, and quick-heating means at one end of said dip pot for heating the lip knives used for applying the filler from the pot to the shoe."

This reference to the patent specifications and claims is necessary to a consideration of the contentions of the parties upon the showing made upon this preliminary application, and in order to meet the insistence that the rulings of the District Court and Circuit Court of Appeals of the First Circuit in a case against another defendant—upon patents 832,002, 808,224, and 808,227—should be followed here. See North Am. Chem. Co. v. Keno S. Co., 227 Fed. 63, 141 C. C. A. 611. In brief, this ruling was to this effect: (1) That the broad claims, 1 to 14, of patent 832,002, were of limited validity, and infringed by the defendant, who was making a gutta percha filler; and, upon a supplemental bill which sought to comprehend, as

a like infringement, a wax tailings filler also made by that defendant, the bill was dismissed, on the ground that these so-called broad claims should be narrowed in their interpretation and application to a gutta percha binder filler. The "loaf" claims were not in contest. (2) That the process patent, 808,224, was invalid, disclosing nothing patentably novel. (3) That the apparatus Arnold patent, No. 808,-227, was invalid, as being a mere aggregation. The suit, however, involved only claims 1 and 2 of the patent, which do not make specific claim to the "superheated roll."

In the case now here, defendants' answer sets up the determination in the Keno Case, and avers invalidity of patents 808,224 and 808,227 as therein adjudged; invalidity of patent 832,002, or, in any event, its limited scope, adjudged in the Keno Case, which scope would not comprehend a wax tailings filler; and, lastly, that patent 861,555 is invalid, because a wax tailings filler, without a modifying or tempering ingredient, is worthless, and, because the original application contained no specification thereof, its introduction by amendment constituted new matter, rendering the patent invalid.

Taking the proofs in the record, it appears without a suggestion of doubt that, at and prior to 1906, the rubber cement filler was universally used; and the proofs refer to (1) the disadvantages attending its manufacture for use; (2) its use in the factory; (3) its merits as a filler; i. e., its durability and effect upon the shoe product; (4) the introduction of "Besto" (which is the name given by plaintiff to its wax tailings filler, manufactured under patent 861,555); (5) its manufacture; (6) use in factory; (7) its merit in the shoe product; (8) its effect upon the art and practice of shoe filling; (9) the process of Thoma as a distinct or new process; (10) the apparatus as a patentably novel introduction in the shoe filling art.

It is impossible here to summarize the testimony of the several witnesses upon these various matters of fact, or to give any summary of all the testimony in the order just noted. But the case, and persuasiveness of the testimony in reaching the conclusion which has been reached, justifies the extended references following:

The witness Pike, who is president of the firm which, prior to 1906, when naphtha rubber cement filler was universally used by the trade in the United States, testifies in great detail respecting its manufacture, its use in the factory, and its merits as a filler. After giving the proportions of ingredients used, he says:

"Because of the inevitable and rapid deterioration of this kind of filler, it could never be made at the cement factory and shipped as filler; but each shoe factory was obliged to keep its own supply of cork and its own supply of filler cement, and dole these out separately in small quantities to the workmen each time the latter required a fresh batch of filler."

Reference is then made to the changing consistency of the filler, because of the variation of the naphtha and the consequent unsatisfactory condition necessitating taking the time of operators to attend to keeping the mixture of the right consistency. He then adds:

"A more serious objection, however, to this filler, was due to the extremely great fire hazard caused by the excessively rapid production of naphtha

fumes or gases, due to the spreading out in the extremely thin layers of filler in the shoe bottoms of so many shoes in tiers of hundreds of racks tightly packed over a large floor area. The inflammable and explosive fumes from the filler supply barrel was objectionable and dangerous, but it would be hard to conceive of a more effective way of increasing this danger and risk than the congested accumulation of filled shoes, which it was absolutely necessary to hold at this part of the factory for the long period required for the filler to set sufficiently to permit the shoes to be passed on to the next step in their manufacture."

He refers to the provision in factories of power-driven fans and expensive dry-heated rooms to hasten the setting of filler and to dispose of the gases which would otherwise accumulate, and to the injurious effect of the naphtha on the health of operators. He explains in detail the effect of the use of rubber combined with naphtha; the latter being merely an expanding element which, when evaporated, would leave the dried rubber and cork in a position and in a condition to bunch. He says:

"This bunching tendency of the rubber cement filler and squeaking accompaniment were the two most serious disadvantages attendant upon the use of this filler. For many years these two disadvantages were recognized as so serious and important that many inventors got up fillers to take the place of rubber cement filler; but they were all failures. Each one, after a few weeks or months of trial, proved impracticable, and they were successively abandoned."

Of the plaintiff's filler, the "Besto," he says:

"As soon as the Besto shoe filler came upon the market I realized that the shoe-filler problem had at last been solved. Besto filler is an entirely new kind of filler, meeting all the requirements of the trade, both from the shoe factory standpoint and from the wearer's standpoint, and has none of the objectionable features of the old rubber cement filler. It has long since superseded the rubber cement filler, and, in fact, it so rapidly supplanted the latter that by the year 1908, or thereabouts, we quit pushing our filler cement, and have since then considered rubber cement filler as practically a thing of the past, although there are still a very few small manufacturers who occasionally use it. * * * So far as I am aware, the Besto filler was an absolutely new product, and new in kind, and the Besto machine was likewise new, and, in fact, the first and only filler machine that I had ever seen or heard of, at the time of their appearance, in 1905."

The witness Broughton, of large experience in the manufacture of shoes and in making of rubber cement, testifies in connection with the advance of plaintiff's filler upon the market:

"I soon recognized that Besto filler had come to stay, and that the days of rubber cement filler were numbered. The fire risk which had always accompanied rubber cement filler was gone—there was no longer any fire risk when Besto filler was used. Besto filler would dry in all kinds of weather, and there were no longer any 'dog days' for the bottoming room; but the shoe manufacturer could shove his shoes along as rapidly as the filler boys could fill them. In explanation of what I mean by saying that there were no longer any dog days for the bottoming room, it is necessary for me to explain that rubber cement filler in the bottoming room always held up the work of the entire factory. So common was this that shoe factories had the recognized term 'blockades,' with reference to the delays in the bottoming room, made necessary by waiting for the rubber cement filler to dry in the shoes. A 'blockade' means an unusually great number of shoes waiting in the bottoming room for the rubber cement filler to dry out, while the departments

further along in the manufacture are at a substantial standstill because they cannot proceed in their normal course, but are specially held up because of damp weather, which affects the drying out of the rubber cement filler in the bottoming room. Under the best conditions of weather and factory equipment one-half day was necessary for the rubber cement filler in the shoe bottoms to dry out, and in 'dog day' weather I have known the factory to be held up for a whole 24 hours waiting for the rubber cement filler to dry out. This is what I mean by 'dog days' in the bottoming room. Besto filler ended the 'dog days,' because it proceeded on an entirely different principle, namely, that of heat. In fact, to me as a practical man, more skilled in the art of cements and shoe manufacture than in patents, the main invention in Besto is that it depends upon heat. The thing that knocked us out was that Besto set at once, while rubber cement filler had to dry out naturally. When the Besto people came with the new idea of hot filler—a filler used hot and applied through the use of heat in the machine and in the roll—they brought something into the business which had never been heard of or thought of before, and we simply could not compete with them. This use of heat ended all delays and made it possible to use a filler having a totally different character from the rubber cement filler. Heat not only made the filler quick-setting, but it melted some of the binder into the seams and crevices and approached the filler problem from an en-tirely new angle, so that; instead of having a filler that very slowly found its final condition, we had to compete with a filler that was immediately and al-ways in its final condition, and made a shoe ready at once to proceed in its fur-ther manufacture. In short, with the hot Besto filler, the time required be-tween the filling outfit or machine and the sole-laying machine is reduced to minutes, while with rubber cement filler the time was a matter of hours."

The witness Hadley, also engaged in the rubber cement manufac-ture, testifies:

"Here was a filler whose most striking feature was that it set instantly. This was because heat was used, and when applied it quickly parted with its heat, so that when it became cold, or nearly cold, it was actually set, and then would set no more, but always remained plastic and sticky. It was an absolutely new idea in fillers. The result of this was more far-reaching than it might first appear. It reorganized the factories. Instead of having to time the different departments for a halt or delay of five to ten hours in the bottom-ing room while the rubber cement filler was getting dry enough to proceed, the shoes were not halted at all, but went right straight forward to the sole lay-ing. This not merely changed the timing of all the rooms throughout the factory subsequent to the bottoming room, but it released a large amount of floor space which had previously been required for the accumulated shoes, and it decreased the number of lasts and the number of racks, and did away en-tirely with all special drying apparatus, and did away with several cementing processes, including the cementing machines and operators, and it introduced certainty, where previously there was uncertainty. For instance, referring to the last point, the sole leveler with Besto knows that the racks will come along exactly according to the speed of the filler operators, with no delay whatever, whereas, with rubber cement filler there would be an accumulation of say 500 shoes on a dry day in a factory making 1,000 pairs per day, whereas, in ·a very humid day there would be an accumulation of from 1,000 to 1,500 pairs of shoes on the racks, standing there on the floor, waiting for the rubber cement filler to dry out. All of these shoes were standing there with the lasts in them, thereby requiring just so many more lasts. The point, however, that I am mentioning now, is the point of uncertainty or irregularity. If a humid day succeeded a very dry day, there would inevitably be an actual halt in the normal congestion of shoes in the filling room; whereas, if a dry day succeeded a very humid day, the accumulated shoes would dry out faster than the normal wants of the sole-laying operator, so that he would be unduly rushed. This irregularity, of course, was transmitted all along down the line through the rest of the factory. All this stopped when Besto arrived. Moreover, the untidy and wasteful conditions of the rubber cement filler were

no longer necessary, and the use of the Besto machine made it possible for the operator to fill his shoes more rapidly and accurately, and to waterproof them in a superior degree."

## The witness Knowles testified:

"The delays and difficulties which we used to experience with rubber cement filler kept the whole output and the entire shoe factory in a condition of uncertainty, and largely dependent upon the weather. Hence it was no small boon to the shoe manufacturer to remove all the troubles and causes of complaint at this vital part or center of the shoe factory. Besto filler and the Arnold machine made these troubles a thing of the past, and they effected large economies. In the average large factory the mere elimination of delay by Besto filler saved from 5,000 to 10,000 square feet of floor space; saved many thousands of lasts (depending upon the number of styles carried, frequency of changes, and grade of shoes made); saved expensive drying apparatus or appliances, and in some factories saved an entire drying room; permitted all the machines and shoe-making equipment, subsequent to the filling end of the bottoming room, to be rearranged more advantageously and compactly (because no longer necessary to provide for the congestion always inevitable in wet weather with rubber cement filler); saved considerable labor, and made the use of some of the old cementing machines unnecessary."

## The witness Chamberlain testified:

"In some of our factories we had special drying rooms, steam-heated, into which we would run the racks of shoes filled with rubber cement filler. In some of the factories we had big fans overhead, with big leather board shields or deflectors to direct the wind currents hard onto the bottoms of the upturned shoes. These fans were power-driven. Without these fans and drying rooms we could not get the shoes around the same day. When Besto came in it saved us more than half of the floor space, because the shoes could go right along without any delay. Besto saved in just the drying space alone fully 4,600 square feet of floor space in the Keith Company's factories. Our business was not more than one-fifth as large then as now. Also it gave us uniformity and certainty. By this I refer to the fact that, in spite of our drying apparatus and drying rooms and our utmost care, we would always have trouble with rubber cement on wet days, and everything would get blocked up or 'blockaded.' Nothing of this sort could happen with Besto. It was a big relief to the factory manager."

Other witnesses, to whose testimony particular reference will not now be made upon this branch of the case, testified with the same degree of particularity to the same effect. In view, however, of the reliance placed by the defendants upon the ruling in the Keno Case above noted, it may be observed that the court in that case found upon the evidence before it:

"The use of rubber cement fillers has been almost everywhere abandoned in favor of a filler made and sold by the plaintiff under the name of 'Besto.'"

The testimony of these witnesses, Hadley, Norwood, Barnes, Pike, Broughton, Chamberlain, and others, discussing in detail the various elements of the filler compound, leaves no doubt that the filler is, and is intended to be, a mechanical compound, and in no sense chemical, in whose making there are or can be chemical changes or reactions necessary to produce the desired result. Their testimony, too, is unequivocal in support, not only of the utility, but practically of the indispensability, of the Arnold hot roll apparatus in practicing the art of applying the filler. It may be observed that 1,000 of these

machines have been installed in 400 of the shoe manufactories, and that they are the instrumentalities for applying this filler to a product which is counted annually by well-nigh hundreds of millions of shoes.

This testimony comes from witnesses, some of them of lifelong experience and close application to shoe manufacture and to the shoe industry, and some of them the representatives of a second generation of families in the manufacture of shoes. All of them speak with the authority of those who know what has happened in the great shoe-manufacturing industry. They testify unstintedly in praise of the change wrought by the new filler and the necessarily new method and new apparatus of applying it; they testify, not merely to the meritorious advance which it has made as a filler, but to the revolution it initiated in the industry; they testify to it, not as superseding a product or a state of affairs to which there could ever again be a return as a matter of choice, but as a fundamental change of product, of method of use, which had produced a corresponding change or order, organization, and results, in the filler branch of shoe making. It is more than proof of ordinary commercial success; it is proof of a complete supercession of the prior art in respect of product, method, and apparatus. This is what the proof shows, without regard to any of these four patents or their claims or specifications, and upon this testimony the plaintiff is justified in its statement of the facts thus:

"It was the first 'hot' shoe filler which had ever been known or used, or even proposed. It was a hot filler, in the sense that heat had to be employed in its original manufacture, and it was a hot filler in the sense that heat had to be employed in its application to the shoe in the shoe factory. This was something absolutely new in the shoe-filler art, and its advantages were many and far-reaching, as set forth in the affidavits found in the record. It was the first shoe filler which ever was, or could be, manufactured in commercial quantities and distributed throughout the country and carried in stock, ready for use. Prior to its introduction there was no such industry in existence as the manufacture of shoe filler of any kind. Now it is an important one. It was the first and only shoe filler which was normally, as manufactured and distributed and kept in stock, in the condition in which it was to permanently remain after being placed in a shoe. It was the first and only filler that would instantly 'set' after being applied to the shoe, and which therefore involved no delay whatever in the progress of the shoes through the successive stages of manufacture. It was the first and only filler which would remain permanently unchangeable in the shoe, and never disintegrate and bunch up, and produce squeaking and discomfort to the wearer."

[1] It is my judgment that the court is not only permitted, but is required, to consider the plaintiff's claims, in view of the time and condition under which the four patents were brought out. They were practically concurrent and copending patents. Each one seeks to be contributory in a greater or less degree to the advance or change in the art which it is proposed to bring about. Whatever might have been the course to be pursued in interpreting or construing them, if they appear to be otherwise independent, the court is not at liberty, nor is it fair to the patentee, to ignore the express reference made in these several patent records to the pendency of the other patents and the general purposes sought to be accomplished by the four patents as a whole. If the problem concerned the interpretation of land or

other property grants, each containing references to the provisions or the purposes of the other, the court would not hesitate to fully refer to all of them for the purpose of ascertaining the true intent and the construction to be placed upon each, as well as upon all. Therefore the question in the consideration of these patents really comes down to this: If, as a matter of fact—and that such is the fact I have no hesitation in finding—these four patents were designed by the patentees, as well as by the government, to reach both generic and specific situations with respect to the filler, its application and the method inhering in its use, and if the public during 10 years of the lives of the several patents has in fact accorded such scope and operation to the patents, is there anything in the patents which compels the court, upon the issue here presented, to deny to any or all of the patents the broad as well as the particular intent and scope?

Taking patent No. 861,555, there is no suggestion in the record which can be seized upon in support of any claim of invalidity, and the defendants seek to avoid what would otherwise be an admitted infringement by the claim that others had defied the patent. It suffices to say that there is no merit whatever in this contention, and there is scarcely a scintilla of proof which supports it. The defendants' wax tailings filler is the exact product referred to in these patents, and if the infringement involved nothing further, this phase of the case could be passed with a mere direction for an injunction restraining the defendants from further making and selling the wax tailings filler. The infringement, however, must be considered in connection with the claims of patent 832,002, which are broad and generic; likewise the claims of that patent covering the loaf form of package. This will be done later.

The controversy over patent 832,002 involves the contention that the first 14 claims, which on their face are broad and generic, are invalid for want of definiteness and precision; that they cannot comprehend the wax tailings filler manufactured by defendants, and which, as above noted, is adjudged to be a clear infringement of patent 861,555; that such claims have been adjudicated by the Court of Appeals for the First Circuit in the Keno Case above referred to, and that in any event they can have no broader interpretation or scope, except as covering gutta percha filler; that the loaf claims are invalid, as not disclosing patentable novelty.

The view taken by the court in the Keno Case involves so fully the entire discussion raised upon the claims in issue under this patent that that case of necessity is entitled to extended reference. The trial court considered claims 1 to 14—the so-called broad and generic claims—and, after describing the there defendant's process and product, holds said defendant to be an infringer in the following language:

"The defendant thus omits the gutta percha of the formula whereby the patentee says he has obtained the best results, using instead more resin and pontianac resin. The patentee has stated that other vegetable gums, pontianac among those he names, may be used instead of gutta percha. The asphalt and brown pitch, which are added in small proportion, fall under the description of mineral oils. The defendant, like the plaintiff, has provided a binder for its cork base without using an ingredient containing naphtha, and

has thus done away with the delay due to the slow setting of a mixture containing naphtha, and the objectionable features due to its evaporation. It substitutes, for certain ingredients in the patentee's preferred mixture, only well-known equivalents. I see no reason to doubt that it makes its filler by what is in substance the method of the patent; and, restricting the claims in issue to a shoe-bottom filler produced according to the disclosure of the patent, I think they are infringed if they are valid. It does not seem to me that the patentee's described method of making a shoe bottom filler can fairly be said to be anticipated by the prior patents to Peterson (1882), Grunzweig (1889), or Goodall (1891). In neither of these is the production of a compound adapted for use in filling shoes contemplated, nor does either appear to show how such a compound may be made."

The court then, in declining to give the claims a broad construction and scope, says:

"I do not find sufficient ground to believe that the invention described in this patent is properly to be regarded as 'pioneer' in character, or that the product thereof is 'new' in the sense necessary to support the plaintiff's contention. So far as appears from the disclosure of the patent, the patentee did no more than show how to make a filler free from the disadvantages he mentions involved in the use of fillers containing naphtha. Except for those disadvantages, the rubber cement filler does not appear to have been unsatisfactory. The evidence affords reason to believe that, apart from them, it was little, if any, inferior in any essential respect to that produced by the patentee, provided that the rubber cement was of the best quality and free from adulteration. What the patentee provided, therefore, was an improved filler, but not one sufficiently superior in quality or different in kind from anything before known to justify calling it a new filler, or regarding the patentee as first in a new field of invention."

The court then comments upon the success of plaintiff's Besto filler, that it contains "hardly any of the ingredients mentioned in the patent, and is not prepared according to the method therein described (patent 832,002); that it is made of wax tailings rendered elastic by the addition of paraffin oil according to the disclosure of patent 861,555. Then in dealing squarely with plaintiff's contention for the validity of the broad generic claims of patent 832,002, and the reference contained in the other patent respecting its subordination thereto, the court says:

"No decision is found in which it is held or recognized that the product or a described process, whether it be called a manufacture or a composition of matter, can properly be claimed in terms like these, so as to cover every product to which the same terms are capable of application. If there are any circumstances in which such claims for a product could be held valid to their full extent, I am unable to believe that they can be so treated in a case like this, where the invention is, at most, of an improved filler, not of one wholly different in kind from any that preceded it."

In the final disposition of the matter is found this language:

"In view of the fact he [Thoma] appears to have devised and disclosed an improvement of value, I do not regard the character of his claims in suit as sufficient ground for holding them invalid, as the defendant contends."

On the proposition of holding these broad claims valid or invalid, it really held them valid, but narrowed them to a product composed, as specified, of the gutta percha binder and cork, and then held them infringed because the defendant there was using "well-known equivalents" of elements or ingredients and methods. This attitude of

the trial court is a matter of importance, in view of the subsequent disposition by the Court of Appeals. The latter, after citing the statutory requirement for precision and certainty, and noting the difficulty of application of the rule, doubtless appreciated the situation when it said:

"In the case at bar, which with reference to the claims which absolutely lack any statement of any specific proportions, it is plain that the application of this rule is difficult, because the specification deals at great length with numerous elements necessary to be taken into consideration before it can be determined that the generic expressions in these claims which we have copied are capable of any certain application, or any application except one involving experiments by persons who are only ordinarily qualified in the art, or the use of the spirit of invention."

The court, having stated that its views were "not entirely harmonious" with those of the District Court, disposes of the matter and affirms the ruling in this language:

"The court below seems to have gone outside of the claims for the purpose of finding an interpretation for them, and seems to have accepted the invention intended to be covered, not merely by reading the claims under the ordinary rules of interpretation, but by supplying that in which the claims are absolutely lacking—precision and definiteness. Nevertheless we have carefully examined the positions of the respondent, and we do not find that the claims were asserted to be defective or void by reason of the propositions to which we have referred; so that, notwithstanding what we have said in reference thereto, we do not feel justified here in assuming to be wiser than the parties, or assuming to declare claims void for reasons not asserted. Consequently we have been compelled to draw out from the opinion of the court below for what reason it held this patent valid.

"This seems to come down to the proposition contained in the opinion as follows, referring therein to the inventor, namely: 'In view of the fact that he appears to have devised and disclosed an improvement of value, I do not regard the character of his claims in suit as sufficient ground for holding them invalid; but I cannot give them a construction broader than that adopted above.' This apparently refers to the following paragraph in the opinion of the court, namely:

"'No decision can be sound in which it is held or recognized that the product of a described process, whether it be called a manufacture or a composition of matter, can properly be claimed in terms like these so as to cover every product in which the same terms are capable of application. If there are any circumstances in which such claims for a product could be held valid to their full extent, I am unable to believe that they can be so treated in a case like this, where the invention is at the most of an improved filler, and not of one wholly different in kind from any that preceded it.'

"The effect of all this seems to be that the District Court held that it could not sustain the patent to the full extent of the language of the claims which we have cited, but found that the patent contained something narrower in its practical effect than what is called for by the language of the claims as read without restriction. In other words, the opinion seems to have gone through the whole state of the art and the circumstances explained in the specification, and gathered from the whole what it found to be new. Therefore, while we make out that, after all, the language of these claims may be insufficient, within the rule which we have cited from Mr. Walker, yet, in view of the fact that neither the court below nor the respondent stands on propositions of that character, we feel that it is going beyond the province of this court to assert such a proposition, which plainly involve serious difficulties.

"We apprehend, however, the difficulty arising from the fact of sustaining the patent on a narrower reading than the natural reading of the claims in controversy, and that under the circumstances the invention, as we are sus-

taining it, is a narrow one, while the claims themselves are perhaps broad. It is therefore necessary for us to caution the profession and the public that the patent, is always to be read and interpreted in the manner in which the learned judge of the District Court interpreted it, and not with a mere reference to some possible interpretation which may be put on the claims."

The facts, as hereinbefore found, compel the conclusion that the advance wrought by these patents was not a mere "improvement," but, on the contrary, invention of a primary character. No better or other tests can be applied than through inquiries such as those made and answered by the workers in the art, as detailed in the record. Now the circumstances that, in the commercial art, plaintiff's Besto filler has achieved conspicuous success in driving out and completely superseding the naphtha filler, as the witnesses detail, and that it has achieved this because of cheapness, are not at all relevant to the inquiry respecting the validity or scope of the claims contained in patent 832,002; nor do they in the slightest degree countervail plaintiff's contention that Thoma's real invention was broad and comprehensive, or that the wax tailings and the gutta percha binder fillers are but exemplifications—species—of his broader and generic conception. Indeed, when considered in connection with any one patent alone, and when, as here, the disclosure is accompanied by revolutionary changes of the art, they support the claim, not of mere "improvement," a mere differentiation in degree, but radical, inventive departure. And that in my judgment is the credit to be given to plaintiff's filler, notwithstanding the conclusion reached upon that phase of the patents, in the Keno Case. So that the question is: Did Thoma, although his conception and attempted disclosure was and is broad in fact and in spirit, nevertheless fail in his effort to get the protection of the patent laws, because his claims are not written out so that they can be understood and applied for the accomplishment of a broad purpose?

The view of the trial court in the Keno Case, that, except for the disadvantage (of using naphtha in fillers), the rubber cement filler "does not appear to have been unsatisfactory," can obviously be expressed of any article, apparatus, formula, or situation which has been superseded by another. The methods of communication employed prior to the advent of the telegraph, telephone, typewriter, were all, except for their disadvantages, satisfactory. The fact and degree of invention must necessarily turn upon the character and degree of disadvantage which has been overcome by the embodiment of the new conception. And it may be observed that the suggestion of fact, that, if rubber cement of higher quality were used, the rubber cement filler "was little, if any, inferior to" Thoma's patented filler, is not only wholly without support in the present case, but the testimony of all witnesses—particularly Pike, Norwood, and Chamberlain—and the entire history of the new product and the disappearance of the old, indubitably negatives such to be the fact. Indeed, these witnesses establish beyond doubt that the disadvantage resulting from the use of naphtha were insuperable; that all efforts to overcome them were unsuccessful, because of its influence in expanding the rubber, and then, after evaporation of the former, the lat-

ter dried, with the result of "bunching" or guttering in the sole. And it is a fact of no small significance that during the 10 years' use of Thoma's filler, no one has succeeded in the apparently simple venture of improving the grade of rubber cement filler, to the end of sharing with the Thoma filler the field monopolized by the latter.

It thus appears upon reading the Keno Case that the Court of Appeals, while concluding that the trial court "seems to have gone outside of the claims for the purpose of finding an interpretation for them, and seems to have accepted the invention intended to be covered, not merely by reading the claims under the ordinary rules of interpretation, but by supplying that in which the claims are absolutely lacking—precision and definiteness"; nevertheless its action in holding the claims valid, but narrowly applied, is affirmed—the court at the same time declining to assert that the language of the claim is "insufficient because of the serious difficulties involved," and with apprehension of the "difficulty arising from the fact of sustaining the patent on a narrower reading than the natural reading of the claims in controversy, and that under the circumstances the invention, as we are sustaining it, is a narrow one, while the claims themselves are perhaps broad."

Now, to my mind, the "serious difficulties" attending the invalidation or the narrowing of these claims, the ample reasons for not so rejecting them or cutting them down, may be thus stated:

First. That through such limitation the plain intent and purpose of both the patentee and the Patent Office, the one to disclose, the other to recognize and protect, a broad conception, is frustrated.

Secondly. That the conception and the disclosure is of a compound, mechanical in its nature, the proportions of whose ingredients may be, and in patents covering that kind of invention frequently are, referable to the skill of the artisan, or to experiment properly within the capability of the skilled worker in the art. The question is not: Are proportions stated in the claims? If not, they are invalid. But rather, does the absence in the claims of a statement of ingredients or proportions render futile the effort of one skilled to practice the invention. This latter question frequently, especially in interpreting broad claims, is, and can only be, determined by recourse to the specifications or drawings. When in a compond not chemical wherein reactions or changes in constituent elements, which depend upon proportions and proportions alone, are sought, but a purely mechanical compound, the ingredients and their characteristics are known, the proportion necessary to produce a certain result is frequently left to be determined, either upon judgment or skill exercised upon the strength of information at hand, or to be found upon reference to the other portions of the patent. Thus scores of patents, covering formulæ for mechanical mixtures, contain no further directions for proportion than such as may prove "suitable" to make a "plastic," a "granular," a "lumpy" mass. Now, with respect to the absence of a statement of ingredients in these broad claims, the same tests must be applied. Obviously, if a patentee's invention is broad, the language of his grant must be correspondingly broad. A cardinal rule of interpretation, that general

words are strengthened by exception and weakened by enumeration, doubtless frequently confronts a patentee in his efforts to state his claim so that its language will coincide with his invention. Thus, if Thoma, in his statement of claim of patent 832,002, had said that it comprehended a base "like cork or its equivalents," or a binder "like gutta percha or wax tailings, or their equivalents," no one would have thought the claim invalid, but, on the contrary, would regard the situation as involving an interpretation of the terms "base" and "filler," or "component," in the light of the doctrine of equivalency, as that doctrine may be applied, and the mere absence of such a statement or statements in a claim does not destroy either validity or the broad scope of the claims, if the latter, upon the two considerations next alluded to, can be ascertained.

Thirdly. These very two patents, 861,555 and 832,002, in their specifications apprised the Patent Office of two specific forms of filler and their respective ingredients of indicated proportions, and the patents on their face—aside from the asserted subordination of the one to the other—expressly indicate that the invention comprehends broad equivalents of the specific ingredients. The patents, and the record of their prosecution in the Patent Office, cannot be read without the conviction that recognition to the claim of breadth was intended; that the office regarded the specifications as sufficiently definitive of the broad terms of the claims, and intended, by allowing these broad claims, to recognize the equivalency now demanded. The fact that one patent comprehends a specific nonvegetable binder, while the other refers to vegetable binders, is most striking proof of the purpose on the part of the Patent Office to recognize, in these broad claims, the characteristic of the ingredient to produce the quality of elasticity, pliability, unchangeability, rather than mere origin. In other words, the government framed its grant upon the basis of the information disclosed by the patentee, and trusted to rendering it certain, if need be, by resort to that information now of record in these patents. No rule of interpretation forbids a court from doing that very thing, certainly not as against a defendant who, apparently, is using that same information in his alleged infringement. Of course, if the court were called upon in this suit to answer the question, What do these broad claims include and what do they exclude? by way of enumerating all possible ingredients and their equivalents, or their proportions, it could not be done, any more than it is ever done or required in any broad or generic claim. The problem is no other or different than that arising upon a claim narrow in terms, asserted in fact to be entitled to a broad effect. The question always is: Is the claim susceptible of, and entitled to, an interpretation and scope which will comprehend the act of an alleged infringer? It is my judgment that the government, so far as the present case is concerned, answered that question in the affirmative as between Thoma and the defendant; that the court is bound to affirm that view; and further support is found in this next consideration of patent 832,002.

Fourthly. There is not a suggestion of any fact or circumstance drawn from the prior art which because of that art—i. e., prior dis-

closure of the breadth here claimed—demands that the prior art, and therefore the public, have the credit of the breadth claimed. There is no prior art patent referred to in this case, except Howland, which contains no suggestion that can afford a basis for limiting Thoma either as to kind of filler or method of application—not a suggestion of a filler having ingredients requiring heat for their mechanical union or application. In the Keno Case, neither of the courts found, in the art as shown by such patents, any basis for limitation or for denying to Thoma fundamental differences of characteristics and giving him credit for mere difference of degree. In the present hearing defendant produced, through the witnesses Whitten, Tirrell, Willis, and Hawley, exhibits of filler composed, as they say, of a "layer of comminuted material such as waste flax fiber mixed with a sticky binder of waxy pitch of a bituminous nature. But the inspection of the exhibit will at once refer them to a date in the art prior to even Howland, for they appear to be felt, which could not be used except by cutting out and fitting to the soles. They testify strikingly to the advance in the art wrought by Thoma's compound. The very fact that little, if anything, in the record or practical art, can be cited against these broad claims, is most strongly supportive of the presumption of broad validity.

Fifth. A last consideration arises out of the concession of fact, appearing in defendants' answer and supporting affidavit in this case, that the binder ingredients of patents 861,555 and 832,002 *are* equivalent. True, this concession is made in support of their contention that, because of such equivalency, Thoma "exhausted his monopoly in taking out patent 832,002, and that there is no further patentable subject-matter to warrant a prolongation of the monopoly of his later patent, 861,555, by merely selecting another well-known binder from a well-known group of bituminous binders"; but that contention manifestly concedes breadth of invention which ought to be recognized somewhere, and any considerations of "prolongation" of monopoly ought not to be assertable by an infringer when neither patent has expired.

[2, 3] There remain claims 15 to 29 of the patent under consideration, concerning the "loaf" form of putting up the product. Here again the court should take the larger view taken by the government in granting the patent, and recognize the novelty, the utility, and the practical indispensability of this form of product, in its relation to the larger object of the patent. It is a further suggestion of the marked difference between the old and the new filler—that the latter, because of its characteristics, its elasticity and tenacity, could not be put up and handled in ordinary forms of containers. The claims should be upheld as covering a novel as well as—the proofs show—an indispensable feature of the filler invention. The conclusion is therefore reached that the broad claims of patent 832,002, particularly 1, 4, 7, are valid, no matter what support there may be for upholding them as covering independent invention, and are entitled to the broad interpretation claimed by plaintiff, that the filler "loaf" claims thereof are likewise valid, and that both are infringed by the defendants.

[4] In considering patent No. 808,224 covering the method, or

process, whatever may appear as confusion between process, product, or apparatus, there can be no doubt that the disclosure is essentially of a process new to shoe making. The use of heat in applying a filler, and that alone, upon the record here, makes it patentable. It is the disclosure of "a mode of treatment of certain materials to produce a certain result," and as such quite independently of the mechanism necessary to practice or carry it out. Cochrane v. Deener, 94 U. S. 780, 24 L. Ed. 139, cited in Expanded Metal Co. v. Bradford, 214 U. S. 383, 29 Sup. Ct. 652, 53 L. Ed. 1034. Now, in the case before us, Thoma might have directed the melting of a filler and its application to the shoe bottom with a spoon, followed by pressure with a hot flatiron; and the conception of using heat as a mode of treatment would have been none the less novel. The conclusion is that this patent is valid—infringement is not denied—and I am unwilling to follow the Keno Case.

[5] This leaves for consideration the apparatus patent 808,227. It is needless to say that the views already expressed respecting the Thoma filler patents will permit denial of validity to this Arnold patent only upon a showing that the mechanisms in the art before us demand it. It may be that in the Keno Case, infringement of this patent was evaded because the defendant did not practice the invention disclosed in claims 1 and 2, there in contest. That the defendant here infringes claim 3—we will not consider the others—cannot be contested on the proofs. So it leaves only the question of validity. That this apparatus has been accepted by manufacturers as practically the one instrumentality for utilizing the Thoma filler, and practicing his process or method; that it came into the art as an apparatus which (or whose equivalent) was practically indispensable for using a hot filler; that it has been a "hot filler" machine, respected by the public as enjoying the protection of the patent in question— is not seriously questioned. Doubtless other arts disclosed a steam-jacketed table or melting pot, a heated roll; but there is no suggestion in this record of an apparatus used or usable for the purpose of applying filler to shoes in the manner disclosed. The introduction of the mechanism containing the heated roll, the organization of the apparatus as disclosed, is concededly new in the art, and it was neither aggregation nor mechanical skill; and the proofs here not only support the presumptive validity of the patent, but they go far toward eliminating the possibility of question.

The conclusion is that the patent is valid, and infringed by defendants in the manner and by their conduct disclosed in the proofs. If justification for the great, perhaps inordinate, length of this opinion be necessary, none can be given, except such as arises out of a case involving what are conceived to be inventions of much consequence in a great industry; out of contrary views and results in other litigation, which, upon proofs here, do not appeal to me; views and results which, if followed or adhered to, break down in a large degree these inventions, and destroy the fruits of a decade of recognition and development. The proofs on the facts in the case seem not only satisfactory, but their persuasiveness on practically every branch

is accentuated by the absence of serious effort to gainsay them; and the convictions here entertained upon the ultimate questions of validity and infringement are such as prompt the issuance of an injunction against the defendants conformably with the views. expressed.

Such injunction may be prepared by complainant's counsel.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes