NORTH AMERICAN CHEMICAL CO. et al. v. DEXTER et al.

(District Court, E. D. Wisconsin.  January 22, 1918.)

PATENTS ⊛◯328—VALIDITY—SHOE BOTTOM FILLER—SHOE-FILLING APPARATUS
—PROCESS FOR FILLING SHOE BOTTOMS.

 The Thoma patents, Nos. 832,002, 861,555, and 808,224, and the Arnold patent, No. 808,227, relating to the process, material and apparatus for filling shoe bottoms, *held* not invalid because of prior use.

In Equity.  Suit by the North American Chemical Company and others against Alvin S. Dexter and others for infringement of patent. Decree for plaintiffs.

Edward Rector, of Chicago, Ill., and Quarles, Spence & Quarles, of Milwaukee, Wis., for plaintiffs.

Gillson & Gillson, of Chicago, Ill., Clyde L. Rogers, of Boston, Mass., and E. H. Bottum, of Milwaukee, Wis., for defendants.

GEIGER, District Judge.  The case is before the court upon final hearing, after an exhaustive presentation of a motion for preliminary injunction.  The views of the court upon the latter are embodied in an opinion filed August 1, 1916 (252 Fed. 148) and upon the present hearing there has been a practical concession that, except in the particulars to be now considered and disposed of, there has been no development in the testimony taken for such final hearing which tends or in justice should be considered by the court as demanding or even warranting a conclusion different from that reached upon the former hearing.  Reliance is now placed upon a defense not heretofore raised or suggested, namely, that prior to the date of the invention of the patents in suit a shoe filler, alleged to resemble that of the patents, had been made and used at certain places in New England.  In other words, prior use defenses are now set up and sought to be sustained by the proofs.

These prior uses, two in number, are:  First.  The so-called "Dizer" use, alleged to have occurred at East Weymouth, Mass., some time during the years 1897 or 1898; the filler being prepared by a man named Douglas Easton, and therefore referred to as the "Easton" filler.  Second.  The so-called "Farrell" use, originating with a man bearing that name and at a place called Scituate, Mass., during the years 1900 or 1901, and said to have been supplied to several factories in the New England shoe district.

As in ordinary cases, the consideration of the proofs upon these defenses must be directed to the ultimate question of establishing identity of product or process to the requisite degree of certainty.

Naturally, in the exhaustive preparations made for the former hearing and for the trial of other proceedings involving one or more of the present patents, all having wide publicity, that these defenses were never before suggested must at the outset produce a sort of scepticism respecting their merit. That, however, cannot dispense with an analysis of the testimony and an ascertainment of its legitimate weight and probative force.

The "Easton" filler is ascribed to the "authorship" of one Douglas Easton, who was questioned (he was 80 years of age) to give his recollection of what transpired 20 years ago. His testimony, also that of other witnesses on either side of this issue, may be summarized and considered in its pertinency: (1) To the fact and time of making and using any alleged anticipating filler; (2) character of the filler in respect of ingredients; (3) its consistency; (4) the method and manner of its use and application to shoe bottoms, e. g., whether soft and sticky and whether applied "hot"; (5) the degree of its use, i. e., whether actual public and commercial, or merely experimental.

Taking the testimony of the witnesses:

Easton, while giving emphasis to the infirmity of his memory because of advanced age, and, apparently, because of insignificance of the "filler" incident as an "experiment," gave this answer to a question asking for explanation or description:

"I can tell you better by saying here is the filler (producing two soles with filler on them). The filler will speak for itself a good deal better than my language will. It is made of pitch pine gum tar and bran. I had them on hand in the tannery, and I used them. For one thing, I know the bran was used for a depilatory, or drench, to make a sour of it, to take the lime out."

He identifies a memorandum book containing a recipe:

"Semiflexible filler for shoes. Four parts pitch pine gum, one part tar; melt and add bran, according to your judgment. Apply hot."

This was written into the book in 1898 in response to a request from his employer that he "write off" for him the many things he was "getting up" for use in the shoe factory, etc.—the idea being to preserve them. He expressly disclaims any recollection, except as the recipe furnishes him the fact, and when a call was made for information "how this filler was heated to apply in shoe bottoms," he referred his questioner to "some one who knows better"—in particular to one Orr, a witness, whose testimony is next commented upon.

The observation may be made that Easton was an employé of the Dizer factory, and apparently for many years its "expert." He describes generally the position he held as such; therefore a comprehensive statement respecting the pertinent considerations—the character, consistency, actual or contemplated application, etc., of the filler "discovered" by him and used by his employer—might well have been expected from him as the naturally primary and first-hand testimony; and his inability to give it, necessarily constitutes an infirmity or impairment of the probative force to be accorded to such partial testimony as he gave, and, as will be seen, it must have a like tendency to impair the force of all other testimony which has inherently a sort of secondary quality.

Orr testified to employment by Dizer from 1890 to 1900 as their mechanician; that Easton "made a bottom filler and came to me for something to heat it up, so I gave him * * * a * * * wax pot"; that the hot filler was tried out, and it was found it hardened up too hard; that he had no data regarding the length of time it was used; that it was "tried in the regular line of shoes"; that he does not think it was used six months, and whether it was used as long as three months "Mr. Davis, the foreman, could give a better idea." He testified that there was "quite a good deal of experimenting in different kinds of fillers at that time"; that the Easton filler was heated in the wax pot, applied with a putty knife, but he never actually saw any of it being heated or being applied. He had nothing to do with the manufacture of shoes made in the factory.

His testimony properly draws the comment that he does not endeavor to speak respecting the character, consistency, ingredients, or manner of application of the filler, but confines himself to the single fact of furnishing an appliance to heat up filler. Like the witness Easton, he refers to another, the foreman, Davis, as competent to furnish other facts which were the subject of inquiry.

Davis, after testifying to employment as foreman by Dizer from 1891 to 1899, says that in the fall of 1897 Easton "got up a shoe filler that was used hot," and that it was used in a regular way in the factory for filling the bottoms of Goodyear welt shoes for a period of three or four months; that his employer was making about 100 dozen a day Goodyears at that time. The Easton filler enabled greater expedition in getting the shoes through the factory, but complaint was made of it because the shoes became inflexible. Whereupon "they returned to the use of the old rubber cement filler," and continued to use it until he left. When asked to explain the manner of use or application of the filler, he said:

"When we first got it up, we tried to put it in as he (referring to Easton) sent it up; but we could not use it. Mr. Orr got me up a machine, or a wax pot, I think it was, and I had some wires across to lay our knives on. We used to use a couple of these, a putty knife or a case knife, and we used to lay them on that wire over that hot steam, and have one heating while using the others."

He further asserted that the knives were kept warm or hot by steam that was supplied "to the steam-jacketed kettle."

The significance of this testimony is in its substantive and formal pertinency to the appliances and to the methods used by Thoma as described in the patents in suit. I do not understand that Davis professes to know anything about the ingredients; certainly he did not testify to the consistency of the so-called Easton filler. It is a circumstance worthy of note that he never told anybody about it, or tried to introduce it in factories where he was later employed. But the most significant feature of his testimony grows out of its relation to other testimony, hereafter commented upon, respecting the use—the actual daily use and detailed application—of the filler. Obviously, Davis did not himself work as a shoe filler. He was foreman, and, when he was pressed to fix the date of the so-called "Dizer" use, he said, among other things:

"I had two very bright Italians, and that was while we were using Mr. Eas-
ton's cement, and we had a strike among the welters and stitchers, and we
took a part of them, called the 'Jo Jeff,' and we put them on the Goodyear ma-
chines to help us out there, and I know that was before 1898."

The pertinency of this tying-up of his own testimony with that of
the two Italians, who subsequently became witnesses, can be appre-
ciated in connection with what has just been said, namely, that Da-
vis, being the foreman, never personally worked at applying the fil-
ler, and therefore the detailed facts were obtainable, if at all, from
the witnesses to whom he thus referred.

Lewis, who was superintendent at the Dizer factory from 1890 to
1904, claiming familiarity with the bottom filler used in welt shoes,
testified that he knew of a bottom filler "that was applied hot"; that
they had given more or less thought to finding a substitute for the
felt filler, because the latter was expensive and had to be fitted by
hand; that they tried dust and cork, putting it on with a putty knife;
that the witness saw some stuff advertised in a New York paper, got
a sample of it, which was tried "to make a waterproof shoe," and
"the outcome was Easton's experiment for the filler to go along with
it." He does not remember the ingredients of Easton's filler, say-
ing, "only I know there was pitch and tar or something in it." The
date is fixed during the period of the witness Davis' employment.
Whether, however, it was prior to 1904, he said that it was back in
the '90's—'95, '96, '97, along there. "All along there we experiment-
ed all the time on something, and Davis was running the making room
during that time the entire period." He professed, however, to
speak positively respecting the manner of application of the Easton
filler to shoes, viz.:

"Q. Can you state how the Easton hot filler was applied in shoe bottoms?
A. It was applied hot in a jacketed kettle. Q. Steam-jacketed? A. Steam-
jacketed kettle, and applied with a knife. Q. And were the knives kept hot for
use in laying out on the shoe bottom? A. Yes. Q. How were they kept hot?
A. Laying on the side of the kettle up there, they had some attachment to
keep them hot. Q. So the knives were kept hot with the same steam that
heated the kettle? A. I cannot answer that. The kettle was hot, and the
knives were on a hot or warm surface."

The witness further says that the Easton filler was abandoned,
and the rubber cement filler again used, because the former left the
shoes inflexible. He, too, like the witnesses Easton and Davis, does
not appear to have ever told any one about Easton's filler.

Keene, who was machinist, carpenter—everything in that line, ev-
erything but shoe-making—at the Dizer factory from 1890 to 1900,"
testified to fitting up a kettle for making "what I always called 'Doug's'
filler"; that he was not familiar with the manner of carrying on fill-
ing shoe bottoms, but had something to do with "setting up the para-
phernalia"; that in 1897 or '98 he fitted up a pipe in what is called
a jacket kettle—a steam-jacketed kettle—and the filler material was
heated therein; that he did not know what instruments were used
to put the filler into the shoes; that the job of fitting up steam-jack-
eted kettle was done by him personally under the instruction of the
witness Orr.

The testimony thus far reviewed was offered on behalf of the defendants, and it is well, at this point, to consider its persuasiveness for even prima facie support of the defendants' contention. The obvious weakness, considering it as a whole, is, first, in not establishing, to a fair degree only, the ingredients actually used by Easton in making any filler; and, secondly, whether the filler used at the Dizer factory was in fact such as was made according to the formula which Easton offers in the "recipe," assuming that such recipe is sufficiently proved as an item of evidence; third, the character of the use is rather clearly—and, by the testimony of some of the witnesses, overwhelmingly—shown to have been experimental; fourth, though this becomes apparent upon consideration of both plaintiffs and defendants' testimony, whether any paraphernalia was ever rigged up for the heating and application of this filler, and not, as is suggested in the testimony of the witness Lewis, to use in connection with a waterproof material for "painting" soles.

As has been suggested, the defendants' case upon this issue was left to await with some eagerness the story of witnesses, if they could be produced, who did the actual work of filling shoe bottoms with this so-called Easton filler; and the plaintiffs did produce the identical two witnesses—the two "bright Italians"—referred to by the witness Davis. It is not necessary that their testimony be given verbatim, except in the particulars which appear to respond to the expectation, produced by defendants' witnesses, that it would be corroborative of *their* stories. It is evident that these two witnesses were regularly engaged in using rubber cement filler. Both of them gave testimony whose simplicity of recital leaves no doubt that they had in mind the very times, places, and situations which the defendants' witnesses attempted to recall. Both concur in the defendants' testimony in respect of the use of a little "pail" containing some hard, black stuff, one of them giving his experience thus:

"Q. You say 'sometimes'—do you mean that different batches of this filler were brought to you? A. Sure; different ways. Q. Explain what you mean. A. I mean it was hard to use them. They did not stick very good, and I didn't like to use them, and I only tried a few shoes; then they stopped them again and they used the old stuff for a time; and then they came in again, and asked me lots of times to try them. Q. But, when they would bring in a pail of this hard filler, you would stop using the old stuff and use this hard stuff? A. Only for a few shoes, and then they would go on with the old stuff again. Q. Would you use this hard stuff from the pail, or would you put it in something else and use it? A. No; in the pail. I took the pail. It was so big, you know (illustrating), and it was a tin pail, you know, five or six pounds in a pail, you know—I mean the pail weighs so much, but I don't know exactly how much. Q. Did you ever see that hard filler for a whole day at a time? A. No, sir. Q. How long would there be between times? A. Well, sometimes it would stay a week, sometimes two weeks, and sometimes a month—I don't remember well, but he came lots of times, you know. Q. Did he tell you why he brought you some more of this filler? A. No; only he came up to me and says, 'Try them;' that is all. Q. Did he tell you whether it was all alike, all the same? A. Well, he thought he would bring it a little different each time; but I didn't find much difference in any way when I used it. Q. Did you heat this filler to use it, this hard filler? A. No. Q. Was it hot when you used it? A. No; it was not hot."

On cross-examination he denied positively ever having "some stuff brought up hot in pails from downstairs to fill shoes with," and reiterated his statement on direct examination that "the fellow with a little pail" came round to the witness' place and says " 'Try this,' and I tried them in a few shoes and then he would go again, and I would not see him for quite a while, and then he would bring some more stuff." He denied having some other stuff, brown, not black, in color; likewise having a kettle heated with steam. His recollection is sought to be refreshed by reference to Keene's alleged fitting up of a kettle, and he answered positively that he did not see anything like that at all. He testified to putting the filler in with knives; that it would not stick well in the shoes.

The other witness testified that he recalled some one's bringing in another kind of filler in a pail—dark stuff, with ground cork, that was put into the shoe cold, dipped right out of the pail; used for a day or two. On cross-examination, when his attention was called particularly to matters suggested by the defendants' witnesses as to the consistency and hot or cold application of the filler, he corroborated the other Italian with great emphasis. When his attention was called to the kettle rigged up by Keene, one of defendants' witnesses, the following testimony was given:

"Q. Don't you remember, about that time, Mr. Keene was up there and rigged up a kettle to be heated by steam in the bottoming room, so that you could warm up the filler and put it into the shoes? A. Yes; I remember that. Yes; he put that right side of me; yes."

When re-examined, he testified:

"Q. Now, about that steam kettle that Mr. Keene fitted up, do you remember using something like tar— A. To put on inner sole, I remember that. Q. Well, wasn't that what the steam kettle was for, to heat the tar? A. Yes; I remember that, sure. When they put the tar on the inner sole, I remember that I put that in like and put the bottom filler on top."

The importance of this latter testimony is its utter repugnancy to the defendants' testimony respecting the use of a hot filler or the rigging up of an appliance necessary to use Easton's filler similarly to the manner in which Thoma's is contemplated to be used. The testimony shows—indeed, that is suggested by the witness Orr—that certain stuff, like tar or asphaltum, was being used at that time for painting the inner soles prior to the application of the filler, and this had to be heated before application to the shoe bottom; and very plausibly, and in my judgment probably, defendants' witnesses may have confused the paraphernalia rigged up by Keene for that purpose with the subsequent paraphernalia necessary to apply the Thoma filler.

Upon this state of the testimony, it is possible to reach the conclusion, beyond all doubt, of an anticipating use of the Thoma filler at the Dizer factory in the years 1897 and 1898. I have no hesitation in saying that not only is every matter of fact involved in the inquiry open to grave doubt, but I am quite willing to suggest that the testimony as a whole preponderates quite strongly against the truth of defendants' claim. In considering the testimony of the Italians,

no little weight should be given to the suggestion of the defendants' testimony that they speak directly to crucial matters upon the issue. Great weight should be given to their testimony, because of its perfectly evident disclosure of the picture which each of the witnesses had in mind, and their unaffected and apparently disinterested method of recital of facts. There is no suggestion that, when testifying, they were under any stress of zeal, friendship, or bias for or against either of the parties to the case, and their emphatic denials respecting the details of use of the Easton filler, as testified to by the defendants' witnesses, as well as their perfectly clear explanation of the wholly experimental character of the use, not only throws all of the defendants' testimony in doubt, but, as suggested, preponderates quite strongly against the truth as claimed by it on this issue; and I reach the conclusion that the defendants have wholly failed to establish the Dizer use.

With respect to the "Farrell" filler use, a summary of the testimony may be dispensed with, for these reasons: The inquiry, as with the Dizer use, is directed to the primary questions (1) respecting the making and use of *any* anticipating product; (2) its character, consistency, and ingredients; (3) the manner of its application, i. e., whether hot or with the use of heated implements; (4) the degree of its use, whether public or purely experimental. If it be assumed that Farrell did make some sort of a new filler at the Scituate Mills, what its constituent ingredients were is as a fundamental inquiry susceptible of no answer upon the testimony, other than plaintiffs' counsel gives, i. e., "no living man knows or claims to know." Farrell is dead, and witnesses who knew him in life, who assume that his activities were directed to the discovery or perfection of a new filler, credit him and his activities with total secrecy and mystery, disenabling any and all efforts to elicit reliable information. Those who were interested in the mill—those who worked for or with him—not only attribute to him "a secretive way of wanting to keep his devices to himself, from the man he had there," but all ascribe their inability to testify to the facts inquired about to his apparently complete assertion of that trait. True, one witness volunteers to tell that, as the "backer" of the enterprise, he paid bills for cork, rosin, pitch, or glue; other testimony relates to barrels or containers, marked "Burgundy pitch," purchased and received at the mill; but, except as this gives a basis for inference—more properly conjecture, I believe—respecting their introduction into the filler subsequently claimed to have been used, no witness presumed to speak directly upon ingredients or proportions of admixture entering into the alleged filler.

Now, much testimony not only developed this situation, but, because of it, much more was taken to the end of supplying the defect, through facts disclosing how the filler was used—principally at the Arnold factory. In this way it was aimed to develop facts, respecting not only the consistency and manner of applying the filler, but also, inferentially, its ingredients. But the result, in my judgment, is even more incapable of establishing the defense than that which

arose upon the Dizer issue, for this reason: Witnesses, artisans who claim actually to have applied Farrell's filler, are in utter disagreement pertaining to the consistency of the filler; i. e., whether sticky or pasty, whether it had to be heated before applied, whether a heated knife or other implement was used in its application. The testimony as a whole, as upon the Dizer—and as frequently happens on any—prior use issue, discloses the very frailties and infirmities attending testimony given by witnesses whose recollection must be asserted in the light of perfect knowledge of the present day practice and product. It illustrates again, how the latter, even with perfectly honest witnesses, influences the forgetting of differences which may have been present and the recollection of resemblances in fact absent.

Assuming, therefore, as I think we may, that the testimony of no witness is to be discredited as being deliberately false, the problem involves dealing with testimony relating to occurrences happening in an art where much "experimenting" was evidently being carried on, many years before such testimony was given. The possibility of mistake,' always 'present, ripens into probability, nowhere better exemplified than in the present record, where a witness, apparently credible, at first testified to matters as of the date 1900 to 1901, which, it was afterward shown with considerable certainty, could and did not occur until the time, 1904 or 1905, when plaintiffs' filler had already come into use. So, when we consider, as I think, that defendants' proofs to establish the composition of Farrell's "filler" substantially failed, a conclusion in its favor upon this issue, for that reason alone, must fail. And the conflict which has arisen in the testimony respecting the consistency, method of application, to say nothing of the experimental use of the filler—whatever it was—is, in my judgment, practically incapable of solution upon the basis of ordinary preponderance, wherefore the exclusion of doubt, cannot even be thought of. And in this situation the court may confidently give some considerable weight to the general testimony, given by disinterested witnesses of large affairs, long experience, and intimate association with shoe making, that plaintiffs' was the first acceptable hot filler.

For the reasons—already suggested—that because a summary of the testimony, such as given on the Dizer use, would present no more than a duplication of what is there exhibited, leading to identity of conclusion, no such summary of the Farrell testimony is deemed necessary. The defense has not been sustained.

The defense of want of invention, growing out of the so-called "Fletcher" incident, has not been supported by any proof.

The general conclusion is that plaintiffs are entitled to a judgment decreeing the patents valid and infringed, conformably to the views herein, and in the former opinion, expressed; and such decree may be entered.